Frances Irene SHERMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 41227.

Court of Criminal Appeals of Texas.

May 22, 1968.

Meto Miteff, Fort Worth, for appellant.

Frank Coffey, Dist. Atty., John A. Brady and Truman Power, Asst. District Attys., Fort Worth, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is murder; the punishment, 15 years.

The indictment presented May 26, 1964, alleged that appellant, on or about May 13, 1964, voluntarily and with malice aforethought killed Wallace Sherman by shooting him with a gun.

The case was tried before a jury on February 13, 1967.

Wallace Sherman, the deceased, was the husband of appellant. The homicide was committed in the home which they had occupied with their children prior to their separation about five weeks previously.

Following their separation appellant and the children went to the home of her mother, in a Fort Worth suburb, and the deceased went to Denton, Texas, where he lived and worked with his cousin, Robert Lee Watkins, until the day he was killed.

On April 8, 1964, appellant filed for divorce against her husband and obtained a temporary restraining order and a hearing on temporary injunction and temporary alimony was ordered.

On Thursday, May 7, 1964, the date set for such hearing, the deceased voluntarily agreed to pay appellant $20.00 per week for child support pending final hearing in the divorce action.

No order was signed or entered by the court. Robert Lee Watkins, who accompanied the deceased to the courthouse for the hearing, understood that the first child support payment was to be made on Friday (8 days after the agreement).

Appellant's contention and understanding was that the first payment was to be due Monday (4 days after the hearing).

Appellant admitted that she placed the long distance telephone call at 12:58 A. M. on May 13, 1964, proved by the state, which the deceased answered. Her version was: "I just asked him when he was going to bring my child support; that the kids and I needed the money," and that he "got real mad," said horrible things she did not want to mention and threatened to put her away for good if she got the law on him.

In addition to her testimony to the effect that prior to their separation her husband had beaten her brutally; had knocked out eight of her teeth and had blacked both of her eyes and had threatened to kill her, appellant testified in part as follows:

On her direct examination she testified that she put her car where it could not be seen from the road and locked the doors, the front with a padlock on the outside and the back with a night latch, and after the telephone call, went to bed.

"Q. Could you describe to the jury what happened after that?

"A. I went to bed and went to sleep, and the next thing I knew somebody was standing at the foot of my bed, and I heard them moving, and I had my hand under the pillow with a gun I had bought, and just pulled it out and shot, and I heard somebody run.

As they went through the door I shot again, and I laid there for a few minutes, and I didn't hear anything else, and I looked out the window and seen my husband's pickup parked in front of the house. I didn't know whether I hit him or not or whether he was standing there waiting for me to come out of that room, and I slipped through and out the back door.

\*     \*     \*     \*     \*     \*

"Q. Why did you buy this pistol?

"A. I went to a pawn shop to look for one, and I thought I needed it for my protection.

"Q. Protection from whom?

"A. My husband."

On cross-examination she testified:

"Q. Is it your testimony you did not hear anyone breaking in?

"A. No.

"Q. Or that you did hear someone breaking in?

"A. I didn't hear anyone break in.

"Q. Is it your testimony that someone, presumably your husband, did break in?

"A. He is the one that was in the house, so it must have been him.

"Q. When you woke up you state somebody was standing at the foot of *my* bed. Is it your testimony you don't know who it was?

"A. I didn't know.

"Q. Is it your testimony at this time that you shot a stranger or an intruder in your house, not knowing who it was at the time you squeezed the trigger?

"A. I don't know. Just as I heard something, something woke me up. I don't know what it was. And I had my hand under the pillow with the gun in my hand and I pulled it out and shot.

"Q. Is it your testimony under oath to this jury that you shot a man at the foot of your bed twice without knowing who it was at the time you squeezed the trigger?

"A. I am not used to men standing at the foot of my bed in the middle of the night.

"Q. Please listen to my question. We will go into that area later. My question is this. Is it your testimony to this jury that when you squeezed this gun twice and fired at a person at the foot of your bed that you did not know full well who it was?

"A. I did not know.

"Q. And you didn't know it was your husband until you looked outside and saw the pickup truck?

"A. No, I didn't.

"Q. Is that correct?

"A. That is correct."

On re-direct examination she was asked and answered:

"Q. At the time that you went to bed were you expecting anyone Mrs. Sherman?

"A. No.

"Q. Would you tell the jury what precautions you had taken against

anyone coming into your home uninvited?

"A. I locked the doors.

"Q. What about the windows?

"A. They were nailed down two or three days before.

"Q. Now, at this time who were you locking the doors protecting yourself from?

"A. Well, on the telephone he was real mad because I kept wanting the money for the kids, and he was mad because I had already called twice that day and I called back again.

"Q. This was after you had locked the doors, is that right?

"A. Yes.

"Q. But he was mad at this time?

"A. Yes, he *was* mad.

"Q. Mrs. Sherman, could you try to remember and search—can you remember exactly what woke you up?

"A. No, I don't know what it was. It was something.

"Q. At the instant you woke up and saw this figure there did you recognize who the figure was?

"A. I knew it had to be him.

"Q. You knew it had to be him?

"A. It had to be. He would be the only one breaking in on me; coming in.

"Q. But you did know exactly who the figure was when you first turned around and looked at that figure?

"A. Yes, and I pulled the trigger and he *run* through the door I knew it was.

"Q. At the time you shot at that figure, Mrs. Sherman, who were you shooting at?

"A. My husband.

"Q. Who is that?

"A. Wallace Sherman.

"Q. Why were you shooting at him?

"A. To help save myself."

And on re-cross examination she testified:

"Q. Where were you when you fired these shots?

"A. Laying in bed.

"Q. Did this man or your husband say anything to you before you shot him?

"A. I don't think he did.

\*   \*   \*   \*   \*   \*

"Q. What, if anything, did he do before you shot him?

"A. I just *felt* him walk into the room.

"Q. Had you awakened enough to realize it was him?

"A. I heard the noise on the floor; something, and I pulled my hand out from under the pillow and pulled the trigger and it was my husband."

It was upon this testimony that the trial judge submitted to the jury a charge on self-defense and in connection therewith, and at appellant's request, instructed the jury:

"In connection with the defendant's right of self-defense you are further instructed that in determining the existence of real or apparent danger, it is your duty to consider all of the facts and circumstances in the case in evidence before you *and consider the words, acts and conduct, if any, of the deceased, Wallace Sherman,*

*at the time of* and prior to the time of the killing, and consider whatever threats, if any, the deceased may have made to the defendant and consider any difficulty or difficulties which the deceased had had with the defendant, and in considering such circumstances you should place yourself in the defendant's position and view them from her standpoint alone."

Appellant's three grounds of error relate to testimony offered by the state in rebuttal.

Ground No. 1 complains that the court erred in allowing testimony by the witness Robert Sherman concerning what the deceased told him as to his object and purpose for going to the scene of the shooting.

Ground No. 2 complains that the court erred in allowing testimony by the witness Robert Watkins as to a statement made to him by the deceased out of the presence of the defendant prior to the shooting.

In rebuttal, the state's witness Robert Lee Watkins testified that he was awakened by the ringing of the telephone and asked the deceased, who was answering it, who it was that was calling. The deceased replied: "This is Frances and the children are sick," and speaking into the telephone the deceased said: "Do you want me to come down tonight or wait until in the morning?" Watkins testified that he returned to sleep and the next morning he noticed that the deceased and his pickup were gone.

Robert Sherman, uncle of the deceased, who lived next door to Robert Lee Watkins, testified that the deceased came to his home about 1:15 A.M. and said that Frances called him and told him that two of the children were bad sick and she wanted him to come down there. He further testified that he let the deceased have two gallons of gas and a quart of oil, and pulled his pickup to get it started.

The state contends that this testimony was admissible under the rule of res gestae as tending to show that the deceased was

engaged in a peaceful mission and with peaceful intentions in going to the scene of the killing. Porter v. State, Tex.Cr.App., 215 S.W.2d 889.

Appellant recognizes the rule but contends that the evidence complained of comes under the exception that if the statements be by the deceased and unknown to the defendant, and impinge on a self-defense issue, the statement is not provable because the defendant acts from his standpoint and cannot be affected by things of which he has no knowledge. Porter v. State, supra, and cases cited.

The state points to the absence of any acts or movements of the deceased at the time of the killing which could be held to be hostile in their character upon which appellant relied or could have relied.

Assuming that the testimony of appellant raised the issue of self-defense and that such defense was materially affected by the testimony complained of, we are unable to agree that appellant had no notice or knowledge of the deceased's stated object and purpose in going to the place where he was slain.

■ While appellant denied that she told the deceased that the children were sick or requested him to come, the trial court, in ruling upon the admissibility of the testimony complained of, was not bound to accept her testimony as true.

■ All questions affecting the admissibility of evidence belong to the province of the trial judge. It follows that when the admissibility of a given piece of evidence depends upon some preliminary question of fact, the existence or non-existence of that fact is to be determined by the judge. See McCormick and Ray, Texas Law of Evidence, Second Ed., Sec. 2.

■ Whether appellant heard her husband say to Robert Watkins, whose telephone was being answered by the deceased, "This is Frances and the children are sick," there is no reason to doubt that she heard

her husband say to her immediately thereafter: "Do you want me to come down tonight or wait until in the morning?" and the trial court had ample reason to conclude that appellant's version of the telephone conversation was not true and she in fact knew that the deceased was coming with peaceful intentions.

Appellant's ground of error Nos. 1 and 2 are overruled.

Appellant's remaining ground of error is: "The trial court erred in allowing testimony proving extraneous acts of adultery and intercourse of defendant as effecting her credibility as a witness."

Appellant had testified that she was a good wife and had denied or failed to remember these acts of adultery.

The witnesses who testified to their sexual relations with appellant in rebuttal each testified to having received a telephone call from her after the killing. One of these rebuttal witnesses testified that, contrary to her testimony, appellant was with him until about 11 o'clock the night before and that she called him about 8 o'clock the next morning and said: "Well, I am a widow," and "I shot Wallace last night." This witness testified that he had been dating and having sexual relations with appellant.

The other witness who testified to having sexual relations with appellant also testified that she called him and said she had shot her husband and had called the police.

The evidence complained of was admissible in rebuttal of appellant's testimony and was also admissible under the rule now found in Art. 1257a Vernon's Ann. P.C.

The evidence was not admitted for a limited purpose. The charge limiting it was given at the request of appellant. The error was against the state and appellant is in no position to complain.

The judgment is affirmed.